*E-FILED: June 11, 2012*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RONALD MOORE, | No. C10-01014 HRL |
| Plaintiff,<br>v.<br>ROBINSON OIL CORPORATION dba ROTTEN ROBBIE #42,<br>Defendant. | **MEMORANDUM OF DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

INTRODUCTION

This case was tried to the court February 6-9, 2012. Counsel presented arguments and the matter was taken under submission. The court now issues its Memorandum of Decision (Memorandum), Findings of Fact (Findings), and Conclusions of Law (Conclusions).[1]

The court has endeavored to avoid commingling findings of fact with conclusions of law. However, if any conclusion has inadvertently been labeled as a finding of fact (or vice versa), it should be considered in its true light regardless of the label on it.

---

[1] The Memorandum gives the court's Findings. It also includes some explanation as to why the court made the Findings it did. At times, it discusses the law so that the reader may understand the Findings in context. The Conclusions are separately stated following the Memorandum.

## DISCUSSION

A.   The Parties

Ronald Moore, a disabled person who uses a wheelchair while in public, brought suit against Robinson Oil Corporation dba Rotten Robbie ("Robbie") for denial of access to one of its gas stations. Moore alleges a violation of the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101, et seq.) and related California statutes.

The Rotten Robbie station in question ("the store" or "station #42") is located at the corner of North 10th and Julian Streets in downtown San Jose. It has three concrete islands with the usual gasoline dispensers (pumps), a small convenience store offering snack items and hot and cold drinks, and some space for parking. It was built prior to 1959. Robbie purchased it in March 2001.

B.   Does Plaintiff Have Standing?

The only remedy available to a private litigant under the ADA is an injunction. A disabled person claiming access discrimination must establish Article III standing in order to maintain a suit under the ADA. Plaintiff has the burden of proving both an injury in fact and the real threat of future injury. Chapman v. Pier 1 Imports (U.S.) Inc., 631 F. 3d 939, 946 (9th Cir. 2011). A disabled person who has encountered barriers impeding full access to a place of public accommodation may show standing to pursue injunctive relief by proving either deterrence from returning to the premises or an injury-in-fact coupled with an intent to return. Id. at 944. Courts are to take a broad view of constitutional standing in disability access cases. Id. at 946.

Moore, a middle aged individual, has hydrocephalus (water on the brain), degenerative disc disease, arthritis, and chronic pain syndrome. Since 2005, he has used a wheelchair in public because he has "a hard time walking." He does not use a wheelchair around the house. He drives a vehicle without special modification. He stands to get into and out of his vehicle. He manages by himself to lift the wheelchair into the van before the beginning of a trip and take it out after arrival.

1    As will be discussed in more detail below, plaintiff had no trouble pumping gas but
2 described the convenience store at station #42 as small and cramped. He had trouble
3 negotiating aisles and reaching over the counter to pay for snack items. Most importantly, he
4 could not use the restroom.

5    Defendant challenges the adequacy of Moore's proof of standing on a number of
6 grounds. First, it says Moore's use of a wheelchair in the store was by choice, not necessity,
7 and he would have encountered no barriers of any kind if he had simply gotten out of the chair
8 and used his cane, as he did at home, to walk around the store and into the restroom. The
9 argument does have some appeal, but the court will not conclude that Moore lacks standing
10 because he has some limited ability to walk. Demanding that he walk unsteadily in crowded,
11 unfamiliar surroundings does not square with Chapman's teaching that this court take a "broad
12 view" of constitutional standing.

13    Next, defendant says that Moore fails to convince that he ever visited its 10th and Julian
14 location at all. This argument turns on plaintiff's credibility. He testified that his illness
15 sometimes affects his memory. Maybe so, but the problem was not lack of memory, but
16 differing memories between what he said in deposition and what he "remembered" when
17 testifying at trial.

18    Moore testified that back in the late 1980's he lived for a while only two blocks from
19 10th and Julian and bought gas at station #42 regularly. He also worked for his brother, a
20 lawyer, whose office was (and still is) eight blocks away at 2nd and Julian. Then, in 1990 he
21 moved to Clovis (by Fresno) and has lived there ever since. He continued to work for his
22 brother from his Clovis location until 2000. The court has no problem with this testimony.

23    Beginning in 2009, plaintiff's brother began to file on his behalf the first of what
24 became at least 63 access discrimination lawsuits against places of public accommodation.
25 Most of the defendants were located in the Fresno area, but some were here in San Jose.
26 Defendant argues that the volume of lawsuits belies that Moore ever intended to return to any of
27 the locations and shows that he just visited places of public accommodation to look for barriers
28

3

so he could sue. Some courts have been persuaded by this argument, but this court gives it little weight, at least in the circumstances presented.

At trial, plaintiff said he visited his brother's law office 30 or 40 times a year, and that he frequently stopped for gas at the location in question. Although he said he always paid with a credit card, he could not, in response to discovery, produce a single credit card statement showing a purchase at station #42. In deposition, Moore said he visited San Jose less than 5 times in the past six months, and he described the trips in terms of visiting his brother's family, celebrating birthdays, watching his nephew participate in sporting events, and the like. The route of travel from Clovis to his brother's home does not go near 10th and Julian. At trial, he testified that in the last year he visited the gas station in question "probably 20 times," which does not square with the other testimony just cited. The court is unpersuaded that plaintiff visited his brother's law office anything like 30 or 40 times a year. And if, as he said, he regularly bought gas at station #42, why does he not have a single credit card statement as proof? If there was business relating to his lawsuits to discuss, why not do it at his brother's home in Monte Sereno during one of his visits there?

For purposes of this lawsuit, Moore claimed he visited station #42 and encountered access barriers four times:

<u>January 20, 2010</u>: In his deposition, he could not remember why he was there that day or who was with him. At trial, he "remembered" it was because of a doctor's appointment at Stanford Hospital and his wife was with him. He says he bought gas by credit card and a Lotto ticket with cash. He produced a cash receipt for the Lotto ticket. No receipt for the gas.

<u>March 9, 2010</u>: Plaintiff says that he was in town to "file this lawsuit" (suit filed on March 10, 2010). And, to buy gas. He produced a cash receipt for two Cokes and one string cheese. No proof of the gas purchase. At one time, he testified his wife was with him; at another time, he said she was not. In one deposition session, he said he could not remember being there at all on March 9.

4

1    September 4, 2010:   At trial, he could not remember why he went:  "I assume it was for
2  business."  In deposition, Moore could not recall ever being at station #42 after March 9, 2010.
3  In evidence is a cash receipt for a soft drink.

4    September 14, 2010:   Another visit alleged in the complaint, forgotten completely in
5  deposition, but "remembered" when on the stand as follows:  he was in town for "the
6  mediation" and his brother wanted to go see something at station #42.  His brother bought some
7  bottled water.  No receipt.

8    It is the court's opinion that plaintiff was a very malleable witness, agreeable to
9  whatever suggestion his brother/lawyer made.  The court is very skeptical of the accuracy of
10 Moore's testimony about dates, or how often he visited San Jose, his brother's office, or station
11 #42.  Nonetheless, there is no denying that his brother's office is close by and that his brother
12 (and his sister-in-law) have been representing him in dozens of lawsuits.  The court is prepared
13 to conclude that Moore did have some occasion to visit that office, that it would not be unusual
14 to stop at a nearby gas station to fill up, and that he likely would do it again in the future.  For
15 standing purposes, the court gives no credit to the "visits" of September 4 or 14, since they
16 occurred after suit was filed.  (The September 14 visit was at the instance of his brother in any
17 event, and plaintiff was along for the ride.)

18   In sum, the court is satisfied that Moore did visit station #42 on January 10 and March 9,
19 2010.  He did encounter certain obstacles to full use of the premises.  He was and is likely to
20 return.  He has standing to bring this suit.

21 C.    What limitations to full access to those in a wheelchair?

22   Moore testified that he stopped at station #42 on January 20, 2010 to fill up on gas
23 following a visit to his brother at his brother's office to discuss what the doctor had just told
24 him about his medical condition.  After pumping the gas, which he could do without difficulty
25 sitting in his wheelchair, he went in the store and bought a Lotto ticket.  There were, he
26 testified, candy and snack displays on and around the counter and the long reach he had to make
27 to pay the clerk for the ticket hurt his back.  Then, he tried to use the restroom, which is
28 accessed through a door in the store.  However, he could not even get to the door because there

5

1  were shelves and other items in the store that blocked his wheelchair. The clerk suggested he
2  try a business across the street. He preceded without difficulty to wheel out of the store and
3  across the street, only to find that he could not gain access to the restroom there either.

4  Plaintiff's March 9, 2010 visit was made because he was in town to "file this lawsuit"
5  and he stopped for gas. No receipt for the gas purchase. He went inside to buy something cold
6  to drink. The area inside the store is small and the aisles were partially blocked with racks
7  displaying snack items. He had real difficulty maneuvering over to the cooler situated along the
8  back wall and had to jockey back and forth to get close enough to open the cooler door. Once
9  again, he experienced pain reaching over the array of candy and snack items in front of and on
10 the counter in order to hand the cashier his money. (His recollection of the subsequent visits
11 occurring in September of that year was extraordinarily hazy and added nothing of substance to
12 his recounting of barriers he encountered to full access to the premises in his earlier visits.) The
13 court is satisfied that plaintiff did experience some obstacles to full access to station #42,
14 especially with respect to use of the restroom.

15 A disabled person who has experienced at least one barrier at a place of public
16 accommodation may in a lawsuit challenge all barriers in that accommodation that are related to
17 his disability, even if he did not personally encounter them. Chapman, 631 F. 3d at 950-51.

18 After suit was filed, plaintiff's expert, Gary Layman, surveyed station #42 and prepared
19 a report cataloging everything with respect to wheelchair access that did not measure up to the
20 very specific and exacting Americans with Disabilities Act Accessibility Guidelines
21 ("ADAAG" or "Guidelines"), 28 C.F.R., Part 36, Appendix D.

22 D.  <u>What legal standard for removal of architectural barriers applies to station #42?</u>

23 The Guidelines just cited apply to new construction and to alterations to existing
24 structures. They do not apply to existing, unaltered structures. <u>Mannick v. Kaiser Foundation</u>
25 <u>Health Plan, Inc.</u>, No. C03-05905PJH, 2006 U.S. Dist. LEXIS 38430 at *12-13 (N.D. Cal., June
26 9, 2006); <u>D'Lil v. Stardust Vacation Club</u>, No. CIV-S-00-1496 DFL PAN, 2001 U.S. Dist.
27 LEXIS 23309 at *14 (E.D. Cal., Dec. 21, 2001). "In enacting the ADA, Congress adopted two
28 systems for regulating building accessibility—one to apply to facilities designed and

6

1 constructed for occupancy before January 26, 1993, and one to apply to newly constructed or
2 altered facilities." Mannick, 2006 U.S. Dist. LEXIS 38430 at *12 (citing 42 U.S.C. §
3 12183(a)(1) and § 12182(b)(2)(A)(iv)). "Only newly-constructed or altered facilities must
4 comply with the ADA Accessibility Guidelines ('ADAAG'), which were incorporated into the
5 DOJ regulations as Appendix A of 28 C.F.R. Part 36." Id. at *13 (citing 28 C.F.R. § 35.151(c)).
6 "When a facility is deemed 'altered,' the altered portion of the facility must be made accessible
7 'to the maximum extent feasible.'" Id.

8 Although ADAAG does not apply to existing, unaltered facilities, the Guidelines do
9 give a road map to help identify barriers in them. Id. at *15 (citing Parr v. L&L Drive-Inn
10 Restaurant, 96 F. Supp.2d 1065, 1086 (D. Hawai'i 2000)). "The demand upon preexisting
11 facilities that are not deemed altered is much less stringent. Existing facilities must remove
12 architectural barriers to access only where such removal is 'readily achievable.'" Id. at * 13
13 (citing 42 U.S.C. § 12182(b)(2)(A)(iv)). "The term 'readily achievable' means 'easily
14 accomplished and able to be carried out without much difficulty or expense.'" Id. at * 13
15 (citing  42 U.S.C. § 12181(9)) and 28 C.F.R. § 36.304(a)).

16 E.     The "history" of station #42

17 The parties stipulated that station #42 was built prior to 1959, and that defendant bought
18 it in March 2001. It is a place of public accommodation.

19 From the time it bought station #42 and until this action was filed, defendant made no
20 alterations to the premises. And, there was no evidence presented that any had been made since
21 the effective date of the ADA.

22 One might speculatively interpret Exhibit 7, a purported floor plan of the store, to show
23 that at some time there had been an exterior door to the restroom which had subsequently been
24 removed and the opening sealed. But, there was no evidence when, or even if, this had
25 happened, and no one could explain just what Exhibit 7 was or why it was prepared. (It was
26 admitted into evidence without objection, but without the benefit of any foundation other than,
27 in answer to the court's question, counsel's statement that it was something found in the papers
28

7

that defendant acquired when it bought station #42.) No one testified that any existing physical evidence at station #42 suggested that there once had been an exterior door in the restroom.

In any event, plaintiff did not seriously urge the court to find that the structure had undergone an alteration that triggered an obligation for full compliance with the Guidelines. The thrust of his presentation was on convincing the court that, despite the many steps that defendant had taken to remedy the barriers identified in expert Layman's report, some still remained and that their remediation was readily achievable.

The question then is whether, by the time of trial, there were still barriers impeding wheelchair access to station #42, and if so, was their removal readily achievable?

F.   "Barriers" that had been removed before trial

In their Joint Pretrial Statement (Dkt. No. 49, Section II(4)), the parties listed and described 28 "barriers" alleged in the First Amended Complaint and stipulated that they had been removed (or, were no longer in contention). Some of these barriers had been outside in the parking area and by the gas pumps. Some had been in the retail area of the store. These barriers dealt with such matters as proper signage, the configuration of the handicapped parking space, aisle space and accessibility in the store, a reachable credit card reader at the pumps, an accessible water bucket to wash windshields, a proper clear space around the front door to the store, and the like. Many of the removed barriers were in the restroom, and they will be discussed in detail below.

G.   Achieving "readily achievable"?

Plaintiff's disability access expert Layman testified about a handful of what, in his opinion, were barriers that still remained and that Robbie had declined to remove. Removal of

these lingering barriers was, in his opinion, readily achievable.[2] The biggest dispute was over the restroom, but this court will first discuss the other ones.

1. <u>The new handicap parking space</u>.

In response to Layman's report and the input of its own certified access specialist, Kim Blackseth, Robbie chose a new area for its designated handicap parking space, repaved the area, and added appropriate striping, markings, and signs.[3] Layman found fault with the ground slope at the space, which he said, based on a single measurement, exceeded the maximum permissible slope of 2% by 0.4%. Blackseth and his assistants took multiple measurements of the space and found no slope that exceeded 2%. The court is satisfied that there was no condition at the new parking space that needed to be fixed.

2. <u>The ground slope on an accessible path of travel from the public sidewalk to the front door of the store.</u>

Layman chose a path of travel where he found ground slope in excess of the ADAAG maximum of 5%. Blackseth explained that there only needed to be one "accessible" path from a sidewalk to the front door. There was a clearly delineated path (not the one chosen by Layman) that had no slope above 5% along its entire route (allowing for the permissible margin

---

[2] There are no ADAAG guidelines that apply specifically to gasoline pumps. However, Layman also found fault with the fact that, by his measurement, someone in a wheelchair using the gas pumps would have to reach in excess of the Guidelines' reach limit of 54". (Recall that plaintiff said he had no trouble using the pumps.) He also opined that somewhere around the concrete pump islands the ground slope exceeded the ADAAG maximum of 2%. The court is aware from the allegations in the First Amended Complaint and comments from counsel that at one time plaintiff was contending that all the gas pumps should be removed and replaced. But, during trial, plaintiff did not claim and Layman did not suggest that removal of barriers associated with reach distance or ground slope at the pump islands was something the defendant should address now, whether or not the readily achievable standard applied. Therefore, this court does not consider the question now.

[3] Both Layman and Blackseth are California Certified Access Specialists, and each have many years experience in the building trade. Layman, however, appeared to have a weak understanding of the ADA's readily achievable standard and made some assertions that seemed flat-out incorrect. It was also his first time ever testifying in court, and he was distractingly surly on cross-examination. He did not come across as especially convincing. Blackseth, in contrast, had testified in court dozens of times (for both plaintiffs and defendants), had weightier qualifications, demonstrated extensive knowledge, and was persuasive.

9

1  of error in the digital level). The court is satisfied that nothing more needs to be done on this
2  score.

3        3.      <u>Objects intruding into the accessible path to the front door.</u>

4  Layman said that a bicycle rack, placed in parallel right along the edge of the path,
5  would impede a wheelchair if there was a bike in it. This rack has been relocated since Layman
6  last saw it. Layman also said that people sometimes improperly parked their cars in front of the
7  store so that their vehicles nudged into the marked access path. (Exhibit 8-6). He
8  recommended installing wheel stops. Blackseth convinced the court that ADAAG did not
9  require wheel stops. The court declines to accept Layman's recommendation, as it is not an
10 ADAAG standard (and thus not a basis for ADA liability).

11       4.      <u>Counter height in the store.</u>

12 Layman measured the counter in the store at 34 1/4" high, which, he said, exceeds the
13 ADAAG maximum allowable height of 34". Blackseth said Layman was wrong: the ADAAG
14 maximum height was 36", and the counter was in compliance. (Exhibit 12-7). The court finds
15 no problem here.

16       5.      <u>A shelf protrudes from the front side of the counter.</u>

17 A 4 ½"-wide shelf protrudes from the front of the counter by one of the registers.
18 Layman testified that it interfered with a person in a wheelchair reaching over the counter to
19 make a transaction (causing a reach greater than 54"). Blackseth said there was no need to
20 remove the shelf because a wheelchair could approach from the side, rather than front-on, and
21 the side reach, even with the shelf in place, was less than the maximum allowable distance. The
22 court sees nothing that needs to be redressed.

23       6.      <u>Location of condiments and creamer.</u>

24 Layman said that during his second inspection, the reach to the condiments and creamer
25 on the shelf by the coffee machine was 61". Maybe so, but they are now moved and well
26 within the 54" reach limit.

27 Putting aside for the moment the restroom, defendant removed or remediated all
28 identified access barriers to wheelchair users that were readily achievable.

H.     The Restroom

The unisex restroom is the big bone of contention here. The space is a rectangle 78 ½" long and 51 1/2" wide. There is room for one toilet and a lavatory (sink). The problem is that in order for a restroom to be fully accessible, the Guidelines specify that for wheelchair maneuverability the floor area should provide a clear 60" turning diameter (i.e., an unobstructed turning circle with a 30" radius). It is physically impossible to get a 60" diameter turning area in a rectangular space that is only 51 ½" wide.

Layman's solution was to create a new, enlarged restroom. This would entail removing one wall (the wall with all the restroom plumbing inside) and expanding into and fully occupying the storage room immediately adjacent. This would about double the space for the restroom. The existing restroom door would be sealed up and the current door to the storage room widened and turned into the entry to the new restroom. Robbie would have to move the sinks now located in the storage room somewhere else. (Those sinks are required for cleaning the coffee-making equipment.) He thought the work could be done for between $30,000 and $40,000.

Kim Blackseth and David Mordick (Robbie's Director of Maintenance, Construction, and Environmental Compliance) offered their own assessments of Layman's solution. The wall proposed for removal partially supports the roof, so cribbing would have to be brought in to temporarily support the roof while the work was done. That would require cutting through the roof and then re-roofing. The floor in the store is a concrete pad. To move the locations of the toilet and lavatory would mean jackhammering the floor, and creating trenches to run new pipes. Another trench would have to be chipped out to connect the only existing drain (in the storage room) to wherever the sinks were relocated. The trenches would then be refilled (presumably, with concrete), floor covered, and new finishes reapplied. The general contractor that would be hired to do the work would have to have a "hazardous" endorsement on his license, which would mean a labor rate of $20 higher per hour than usual. The estimate to do the work is $200,000, plus the cost of preparing plans and the permit fee. The work would take six weeks, and the station would have to close at least one week (could not sell gas). If Robbie

11

1  did all that, it would then have patrons walking behind the registers, into the space where the
2  store clerks worked, in order to use the new door to the new restroom.

3  Robbie's legal obligation to bring the restroom into ADA compliance is to perform what
4  is "readily achievable," meaning what can be carried out without much difficulty or expense.
5  Courts should look at both the nature of what would have to be done as well as the cost.[4]  See
6  42 U.S.C. § 12181(9)(A).  As for cost, there is no doubt that Robbie has sufficient financial
7  resources that it could "afford" to pay over $200,000 to build a new restroom at station #42.
8  But, this court hangs up on the nature of what would be involved to do this.  ADAAG section
9  36.304 gives specific "examples" of barrier removal steps which are readily achievable, and the
10 examples are instructive.  Some of them are:   rearranging furniture, machines, or display racks;
11 changing hinges on doors; rearranging toilet partitions; installing grab bars by toilets and raising
12 toilet seat height; repositioning a paper towel dispenser; and installing an accessible paper cup
13 dispenser by an inaccessible water fountain.  The examples give concrete meaning to the phase
14 "without much difficulty or expense."  Constructing an entirely new restroom double the size of
15 the existing one, even if the cost were "only" $30,000, is not in the "nature" of what this court
16 would contemplate under the "readily achievable" standard.  Defendant was not required to
17 construct a new restroom under the readily achievable standard.

18 Defendant in fact did undertake a complete remake of the existing restroom.  Robbie
19 installed a new toilet at the correct height and the proper 18" clearance from the side wall.  It
20 installed a new lavatory at the proper height and with insulated pipes to prevent burns.  It
21 affixed grab bars on the side wall and the rear wall.  It relocated and lowered the mirror and the
22 paper towel and toilet seat cover dispensers.  It relocated shelves and an ATM machine away
23 from the door into the restroom.  As Blackseth explained it, Robbie "tried . . . [to] provide as
24 much access as we could within the footprint of that restroom."  See photos, Exhibits 8-12, 8-
25 14, 8-16, 12-15, 12-17, 12-18.

---

[4] The parties' focus here was on the nature and cost of remediation and defendant's overall financial resources.  They did not mention or discuss the other factors listed in 42 U.S.C. § 12181(9), which this court took to mean that they did not consider them to be relevant.

12

1    Layman opined that defendant had not done all it could have to improve the existing
2    restroom because it had not widened the door. The Guidelines specified a minimum door width
3    of 32", but the doorway in question is only 27". A width of 27" precludes entry into the
4    restroom to many but not all people in wheelchairs. Blackseth, who is a quadriplegic, said his
5    wheelchair fits through the station #42 restroom door. The problem, however, is that even if
6    one in a wheelchair got through the door, there is insufficient floor space to maneuver the chair
7    once inside. It does not make sense to spend over $8,000 to cut a wider opening in the load
8    bearing concrete block wall to install a bigger door so that someone confined to a wheel chair
9    could get into a restroom where he or she could not, after gaining entrance, maneuver in the
10   chair. Widening of the existing door to the restroom would neither improve access nor be
11   readily achievable.

12   Plaintiff's expert had an idea for improving the restroom without increasing the size of
13   its footprint that he asserted was better than what Robbie had in fact done. First, widen the
14   door. Then, move the toilet from where it is now (the north wall as shown on Exhibit 7) to the
15   west wall. This, he said, would achieve compliance with ADAAG 4.17, Figure 28, "Clear Floor
16   Space at Water Closets." Then, put a triangular-shaped lavatory in the northeast corner of the
17   restroom, and the result is more maneuvering space. Blackseth explained that Figure 28 does
18   not depict a restroom at all, merely a portion of a restroom where a toilet is situated. It shows
19   clearance spaces around a toilet required for ADAAG compliance. It has nothing to do with the
20   additional requirement for a 60" turning diameter. Plus, placing a triangular lavatory at
21   diagonal in a corner would not give sufficient knee space under it. And, Robbie could never get
22   a permit to implement this proposal. If it could be implemented, it would not provide better
23   access than the existing, upgraded restroom.

24   Finally, plaintiff made a fallback argument. If the restroom did comply with the readily
25   achievable standard, but barriers still remained, then the court should look to ADAAG section
26   36.305. That section says that, if the readily achievable standard is met but barriers still exist,
27   an attempt should be made to provide some equivalent alternative, if the alternative is readily
28   achievable. The examples given are: providing curb service or home delivery, or retrieving

13

merchandise from inaccessible shelves or racks. Here, says Layman, Robbie might have rented or bought a disabled-accessible portable restroom (such as those seen at construction sites or outdoor festivals). The court is not persuaded that such a "fix" would qualify as an equivalent facilitation under section 36.305. Further, no evidence was offered that it would actually be feasible. What about security, public safety, or vandalism? Is there a location at station #42 where it could go? Would the City of San Jose issue a permit for a "permanent" portable restroom in an unsecured location in the busy downtown? What would it really cost? Layman merely testified that this was an idea that "could be reviewed." But, he did not review it. So, plaintiff failed to make a credible threshold showing that a portable restroom was readily achievable, and the burden never shifted to defendant to show that it was not. Mannick, 2006 U.S. Dist. LEXIS 38430 at *34 (citing Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I, 264 F. 3d 999, 1002 (10th Cir. 2001)).

The upgrades and modifications made by defendant to the existing restroom remediated access barriers to the extent of being readily achievable. ADAAG § 36.304. And, there was no readily achievable equivalent facilitation. Id. § 36.305.

I.  Conclusions of Law

  1. Plaintiff has standing to maintain this lawsuit.
  2. With respect to remediation of barriers to wheelchair access at station #42, the readily achievable standard applies, 28 C.F.R. § 36.304.
  3. With respect to the identified wheelchair access barriers at station #42, defendant has remediated them to the readily achievable standard. There is no ADA violation.
  4. The only remedy a private plaintiff can obtain for a ADA violation is an injunction. Since Moore has not proven an ADA violation, he is not entitled to an injunction.
  5. Plaintiff also claimed statutory damages under California's Unruh Act (Civil Code § 51) and the Disabled Persons Act (Civil Code § 54 et seq.). However, plaintiff's First Amended Complaint, as well as his one page memo submitted to the court at the start of trial, make it clear that his recovery under these two acts depended on first proving a violation of the

ADA. Since the court finds no ADA violation, Moore cannot recover under either of these statutes.

6. Moore also asserted a claim for injunctive relief based on California Health and Safety Code § 19955(a). This statute requires compliance with certain access guidelines set out in the California Code of Regulations. The duty to take affirmative action does not apply to buildings constructed prior to July 1, 1970 unless the building was altered or structurally repaired. CAL. HEATH & SAFETY CODE § 19959. Even then, the requirements would apply only to the area of the alteration. And, alterations for the purpose of removing barriers to accessibility do not trigger the requirements. This statute does not apply to station #42, and plaintiff cannot recover under it. Mannick, 2006 U.S. Dist. LEXIS 38430, at *16, *44.

7. The filing of Moore's suit did prompt Robbie to eliminate or reduce a number of access barriers at station #42. The court considered whether under the so-called "catalyst theory" a plaintiff who is not the prevailing party, but whose suit did achieve a beneficial result, may recover attorney fees. The court concludes the answer is no. The U.S. Supreme Court has rejected application of the catalyst theory to the recovery of attorney fees under the ADA and the federal Fair Housing Amendments Act (FHAA). Buckhannon Board & Care Home v. West Virginia Dep't of Health & Human Resources, 532 U.S. 598, 121 S. Ct. 1835, 149 L.Ed.2d 855 (2001); Bennett v. Yoshina, 259 F.3d 1097, 1100-01 (9th Cir. 2001) (recognizing that Buckhannon eliminated the "catalyst theory" as the basis of an award of attorney's fees under the ADA, as well as other statutes). Plaintiff may not recover attorney fees.

8. Defendant is entitled to judgment and costs of suit.

SO ORDERED.

Dated: June 11, 2012

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

1  5:10-cv-01014-HRL Notice has been electronically mailed to:

2  Elizabeth Marie Pappy    epappy@mffmlaw.com, cmacias@mffmlaw.com

3  Kenneth Randolph Moore    natalyn@moorelawfirm.com

4  Tanya Eugene Moore    tanya@moorelawfirm.com, jessica@moorelawfirm.com, marejka@moorelawfirm.com, paralegal@moorelawfirm.com